# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

COZEN O'CONNOR
Peter J. Fontaine
Matthew L. Elkin
Amorie Hummel
1010 Kings Highway S.
Cherry Hill, New Jersey 08034
Phone: (856) 910-5000
Email: pfontaine@cozen.com
      melkin@cozen.com
      ahummel@cozen.com
*Attorneys for Plaintiff Weston Solutions, Inc.*

| | |
|---|---|
| WESTON SOLUTIONS, INC., | )<br>)<br>) |
| Plaintiff, | ) |
| | ) |
| v. | )   CASE NO.: _____ |
| | ) |
| EPEC POLYMERS, INC., (*f/k/a* TENNECO POLYMERS, INC. and TENNECO RESINS, INC., *f/k/a* HEYDEN CHEMICAL CORPORATION), | )<br>)<br>)<br>) |
| and | ) |
| | ) |
| GREDEL PROPERTIES, LLC, | ) |
| | ) |
| Defendants. | )<br>) |

## <u>COMPLAINT</u>

     Plaintiff, Weston Solutions, Inc. ("**Weston**"), by and through its attorneys, Cozen

O'Connor, for its Complaint against Defendants, EPEC Polymers, Inc. ("**EPEC**") and Gredel

Properties, LLC ("**Gredel**"), alleges as follows:

## I.     INTRODUCTION

1.      This action concerns a request for declaratory relief and apportionment of responsibility among and between Plaintiff Weston and Defendants EPEC and Gredel for past and future costs of response actions pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("**CERCLA**") and the New Jersey Spill Compensation and Control Act (the "**NJ Spill Act**").

2.      Weston seeks to hold EPEC and Gredel liable for their (and/or their predecessors') releases of hazardous substances into and along Crows Mill Creek and associated wetlands in the Fords section of Woodbridge Township, Middlesex County, New Jersey (hereinafter, the "**Crows Mill Creek Wetland**" or the "**Wetland**").

3.      Weston is an environmental remediation services company that is contractually responsible for investigating and remediating pollution conditions caused by operations or conditions at the "**Hatco Facility**," including pollution that migrated from the Hatco Facility to the Wetland prior to November 4, 2002.  The Hatco Facility and those offsite areas where Hatco pollution has come to be located are hereinafter collectively referred to as the "**Hatco Remediation Site**."

4.      The primary pollutants of concern at the Hatco Remediation Site are polychlorinated biphenyls ("**PCBs**") and Bis(2-ethylhexyl) phthalate ("**BEHP**"), which are designated as hazardous substances under CERCLA and the NJ Spill Act.

5.      Weston incurred the obligation to investigate and remediate the Hatco Remediation Site in 2005, as part of agreements between the Hatco Facility's former owners, the New Jersey Department of Environmental Protection ("**NJDEP**"), and the U.S. Environmental Protection Agency ("**USEPA**").  Weston's engagement is subject to the regulatory oversight of

these agencies.  Weston does not, and has never, owned or operated the Hatco Facility or the Hatco Remediation Site, nor any portion of the adjacent properties at issue in this action.

6.      The Defendants are the current and/or former owners, lessors, and/or operators of three industrial facilities that were located downstream from the Hatco Facility adjacent to the Wetland: the "**EPEC Facility**" (which includes two of these facilities) and the "**Gredel Facility**" (collectively, the "**Offsite Facilities**").

7.      For at least 70 years, industrial operations at the Offsite Facilities released hazardous substances consisting of PCBs, BEHP, and other toxic contaminants into the Wetland.

8.      The Wetland is approximately 26-acres extending almost 2,800 feet south from the Hatco Facility.

9.      For a number of years up through 2020, at the direction of NJDEP and USEPA, Weston conducted a series of investigations of hazardous substances in the Wetland.

10.     The investigations confirmed that hazardous substances released by the Hatco Facility are limited to an approximately 1-acre area in the northern portion of the Wetland close to the Hatco Facility.  This area is referred to as Hatco Area of Concern 25 ("**Hatco AOC 25**").

11.     The following figure (also attached as **Exhibit 1**) depicts, among other things, the Wetland (and the portions owned by EPEC, Gredel, and Woodbridge Township), the Hatco Facility, the EPEC Facility, the Gredel Facility, and Hatco AOC 25:



12.     At the direction of NJDEP and USEPA, Weston has completed extensive delineation of hazardous substances in the Wetland, including collecting and analyzing more than 1,000 samples.

13.     Weston's data demonstrates a clear picture: **the Offsite Facilities—and *not* the Hatco Facility—were responsible for the vast majority of contamination in the Wetland**.

14.     In particular, sample results indicated low concentrations of PCBs and BEHP in Hatco AOC 25, while the highest concentrations of PCBs and BEHP in the Wetland are directly adjacent to the EPEC Facility.

15.     Similarly, sample results detected higher concentrations of PCBs in the Wetland directly adjacent to the Gredel Facility.

16.     Weston's further investigations establish that the Offsite Facilities contaminated the Wetland for decades.

17.     The following figures (also attached as **Exhibit 2**) depict the distribution of PCB and BEHP contamination in the Wetland relative to the Hatco Facility and the Offsite Facilities:

**PCBs**



**BEHP**



18.　　　Weston has incurred, and will incur in the future, necessary costs of response pursuant to CERCLA and the NJ Spill Act to address hazardous substances released by the Offsite Facilities into the Wetland.  Weston is not responsible for these costs.

19.　　　The releases of hazardous substances into the Wetland from the Offsite Facilities are distinguishable and divisible from, and far more substantial than, the releases of hazardous substances into the Wetland from the Hatco Facility.

20.　　　To date, Weston has incurred response costs of around $3 million for its Wetland investigations, as well as additional costs for the disposal of PCB contaminated debris generated by EPEC's remediation of lead battery waste at the EPEC Facility, as described further herein.

21.    Weston seeks cost recovery from each Defendant pursuant to Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a), and contribution pursuant to Section 58:10-23.11f of the NJ Spill Act and New Jersey common law for Weston's past and future costs of response, along with a declaration pursuant to Section 113(g) of CERCLA, 42 U.S.C. §§ 9613(g), and the Declaratory Judgment Act ("**DJA**"), 28 U.S.C. §§ 2201 and 2202, as to each Defendant's liability, and an allocation of past and future response costs.

22.    Weston's investigation of these facts and circumstances is ongoing, and it reserves the right to supplement and update the allegations herein as new information is discovered and confirmed.

## II.    THE PARTIES

23.    Plaintiff Weston is a corporation organized in Pennsylvania with its principal place of business at 1400 Weston Way, West Chester, Pennsylvania 19380.

24.    Weston is an employee-owned environmental remediation services company started in 1957 by Roy F. Weston.  Weston specializes in the remediation and cleanup of hazardous waste sites, and maintains offices in Edison, New Jersey, and twenty-four other locations across the United States.

25.    Weston has incurred response costs in connection with its contractual obligation to Lanxess Corporation (*f/k/a* as Chemtura Corporation) to investigate and remediate certain hazardous substances on or emanating from the Hatco Facility, *i.e.*, the former Hatco Chemical Corporation facility located at 1020 King Georges Post Road, Fords, Woodbridge Township, Block 67, Lot 100.01 (formerly designated as Block 67, Lot 100.01 and Block 60, Lot 1.021) (NJDEP PI# G000003943).

26.     Weston does not, and has not ever, owned or operated the Hatco Facility or the Hatco Remediation Site, nor any portion of the Offsite Facilities or the Wetland.

27.     Defendant EPEC is a corporation organized in Delaware with its principal place of business at 350 N. St. Paul Street, Dallas, Texas 75201.

28.     EPEC is the current owner of a portion of the Wetland and is the successor-in-interest to Tenneco Polymers, Inc., Tenneco Resins, Inc. (*f/k/a* Tenneco Chemicals, Inc.), and Heyden-Newport Chemical Corporation (*f/k/a* Heyden Chemical Corporation and *a/k/a* Nuodex Products Company, Inc.), all former owners and/or operators of the EPEC Facility.

29.     Defendant Gredel is a limited liability company organized in Delaware with its principal place of business at 1717 McKinney Avenue, Suite 1900, Dallas, TX 75202.

30.     Defendant Gredel is the current owner of a portion of the Wetland and the entirety of the Gredel Facility.

## III.   JURISDICTION AND VENUE

31.     This Court has subject-matter jurisdiction over this action pursuant to Section 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b), providing federal jurisdiction over controversies arising under CERCLA, and pursuant to 28 U.S.C. § 1331, providing federal jurisdiction over controversies involving questions of federal law, which is inclusive of this Court's right to fashion appropriate declaratory relief pursuant to the DJA.

32.     The Court has jurisdiction over the contribution claims under the NJ Spill Act and New Jersey common law pursuant to 28 U.S.C. § 1367(a).

33.     Venue is proper in the District of New Jersey under Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a), and 28 U.S.C. § 1391(b), because the release of hazardous substances that

gives rise to this action occurred at the EPEC Facility and Gredel Facility, which are both located in this judicial district.

## IV.  BACKGROUND ALLEGATIONS

### A.  The Wetland

34.  The Wetland is comprised of three parcels, a northern parcel owned by EPEC (Block 93, Lot 100.011) (the "**EPEC portion of the Wetland**"), a middle parcel owned by Gredel (Block 61, Lot 1.01) (the "**Gredel portion of the Wetland**"), and a southern parcel owned by Woodbridge Township (Block 77, Lot 100) (the "**Woodbridge portion of the Wetland**"), as depicted in Exhibit 1.

35.  The EPEC portion of the Wetland extends from Riverside Drive south approximately 1,100 feet.

36.  The Gredel portion of the Wetland extends from the southern boundary of the EPEC portion of the Wetland south approximately 1,100 feet.

37.  The Woodbridge portion of the Wetland extends from the southern boundary of the Gredel portion of the Wetland south approximately 600 feet to the boundary with Trap Rock Industries.

38.  From there, Crows Mill Creek continues south approximately 1,300 feet to the Raritan River.

### B.  The Hatco Cleanup Agreement

39.  In 2005, Weston entered into agreements with the NJDEP and the then- current and former owners and/or operators of the Hatco Facility (*i.e.*, Hatco Corporation, W.R. Grace & Co.-Conn., and Remedium Group, Inc.) (collectively, the "**Original Hatco Parties**"), pursuant to which Weston agreed to conduct "Investigation and Remediation" of certain "Pre-Existing

Pollution Conditions" at and/or emanating from the Hatco Facility on or before November 4, 2002.

40.     Weston's agreement to conduct Investigation and Remediation of Pre-existing Pollution Conditions at the Hatco Remediation Site was memorialized in a: (a) Settlement Agreement between Weston, NJDEP, and the Original Hatco Parties; (b) Administrative Consent Order between NJDEP and Weston; (3) Remediation Agreement between Weston and the Original Hatco Parties; and (4) a letter from the USEPA pursuant to the federal Toxic Substances Control Act ("**TSCA**") approving a risk-based disposal application relating to the planned remediation of PCBs at the Hatco Facility (collectively, the "**Hatco Cleanup Agreement**").

41.     Pursuant to the Hatco Cleanup Agreement, Weston is only responsible for environmental contamination resulting from hazardous substances at or migrating from the Hatco Facility if those hazardous substances were resulting from pollution conditions occurring prior to November 4, 2002 (*i.e.*, the Hatco Remediation Site).

42.     Weston is ***not*** responsible for hazardous substances outside of the Hatco Facility that did not migrate from the Hatco Facility.

**C.      The Hatco Facility**

43.     The Hatco Facility occupies an approximately 78-acre parcel bounded by King Georges Post Road to the north and Riverside Drive (formerly Industrial Drive) to the south.

44.     The Hatco Facility began operations in 1954 with a primary focus on manufacturing various phthalate ester-based products, including phthalic anhydride, plasticizers, and synthetic lubricants.  Phthalate ester-based waste products tend to float on the surface of water and are considered Light Non-Aqueous Phase Liquids ("**LNAPL**").

45.     Beginning in 1929, Monsanto Corporation (*f/k/a* Swann Chemical) sold a suite of heat-resistant chlorinated biphenyl products—PCBs—for a wide variety of industrial uses, including heat transfer applications, nonflammable sealing waxes, plasticizers in paints, varnishes, lacquers, and adhesives, and dielectric fluids in electrical transformers and capacitors, among others.

46.     Monsanto's PCB products bore the name "**Aroclor**" followed by a four-digit number, with the first two digits representing the number of carbon atoms in the phenyl rings (for PCBs this is 12) and the second two digits representing the percentage of chlorine by mass in the mixture.

47.     For example, the product name Aroclor 1248 means that the PCB mixture contained approximately 48 percent chlorine by weight, Aroclor 1254 contained approximately 54 percent chlorine by weight, and Aroclor 1260 contained 60 percent chlorine by weight.

48.     Between 1961 and 1966, as was common in organic chemical manufacturing and a wide variety of other industries, the Hatco Facility used two Aroclor products, Aroclor 1248 and Aroclor 1254.

49.     The Hatco Facility used Aroclor 1248 to facilitate heat transfer in the boiler system used in the chemical manufacturing process.  Aroclor 1248 was widely used due to its fire-resistance and its capacity to withstand the excessive heat needed to manufacture many organic chemicals, including phthalate resins, paints, varnishes, and adhesives.

50.     The Hatco Facility also used Aroclor 1254, a plasticizer additive used in an off-color plasticizer product.  Aroclor 1254 plasticizer was widely used by manufacturers of phenolic resins, varnishes, and paints as a plasticizer additive.

51.    Another Monsanto PCB product, Aroclor 1260 plasticizer, was also widely used by manufacturers of phenolic resins, varnishes, and paints as a plasticizer additive.  However, the Hatco Facility **did not** use Aroclor 1260 in its operations.

52.    Over the years, spills and leakage from the Hatco Facility resulted in contamination of soils, groundwater, surface water, and sediments on the Hatco Remediation Site.  The source of contamination was PCBs, primarily Aroclor 1248, and to a lesser extent Aroclor 1254; various phthalate esters, most significantly BEHP (*a/k/a* Di(2-Ethylhexyl) Phthalate or Dioctyl Phthalate); and minor amounts of volatile organic compounds.

53.    Thus, the two primary contaminants of concern driving the remediation of the Hatco Remediation Site are PCBs (Aroclors 1248 and 1254) and BEHP.

54.    PCBs and BEHP are hydrophobic compounds, meaning they are relatively insoluble in water and have a propensity to adsorb (*i.e.*, attach) to soils and sediments.  However, PCBs are freely soluble in phthalate esters (including BEHP) such that PCBs in contact with phthalate ester LNAPL will tend to dissolve into the LNAPL.

55.    From 1957 to 1970, the Hatco Facility treated its process wastewaters containing BEHP and other phthalate esters, plus spent PCB oils, through a series of settling ponds located in the southwestern portion of the Hatco Facility.  In these settling ponds, the phthalate esters and PCB oils were allowed to partition and float to the pond surface for skimming and recovery, and they were returned to the manufacturing operation to produce an off-color plasticizer product.

56.    The Hatco Facility settling ponds were constructed near the headwaters of a roughly mile-long stream called Crows Mill Creek.  The northern 700-feet of Crows Mill Creek was located on the Hatco Facility.  From there, the creek traveled south beneath and across Riverside Drive and through the Wetland.

57.     The Hatco Facility settling ponds discharged to the Crows Mill Creek headwaters from about 1958 to 1966, and then to a manmade channel leading to Crows Mill Creek referred to as "**Channel D**" from about 1966 to 1968.  Channel D joins Crows Mill Creek about 275 feet south of Riverside Drive.

58.     The Hatco Facility connected to what is now known as the Middlesex County Utilities Authority ("**MCUA**") public sewer system beginning in November of 1966 and reaching completion by August of 1968.

59.     Given the insolubility of PCBs and BEHP in water, the migration of these contaminants from the Hatco Facility occurred primarily through LNAPL and adsorption to sediments within Crows Mill Creek and Channel D, with only a very small fraction dissolved in surface water.

60.     Prior investigations of Crows Mill Creek and Channel D by the Original Hatco Parties determined that PCBs and BEHP from the Hatco Facility did not migrate within Channel D more than about 200 feet south of Riverside Drive, about half-way to the point where Channel D joins Crows Mill Creek, based on data indicating very low PCB and BEHP concentrations.

61.     Multiple investigations by Weston have determined that only Hatco AOC 25 (*i.e.*, the approximately 1-acre northern portion of the Wetland close to the Hatco Facility) has been impacted by Hatco Facility operations.  (*See* Exhibit 1.) [1]

_____

[1] Hatco AOC 25 is the extent of offsite impacts from the Hatco Facility in the Wetland.  At one point during Weston's investigation phase, the aerial extent of Hatco AOC 25 was postulated to include the downgradient portions of the Wetland, including the entirety of both the EPEC portion of the Wetland and the Gredel portion of the Wetland.  By 2020, Weston completed its investigation of the Wetland and confirmed that impacts from the Hatco Facility are limited to only Hatco AOC 25.  The Hatco Remediation Site boundaries include Hatco AOC 25.  Hatco AOC 25 is also impacted with releases of hazardous substances from the Offsite Facilities, namely the well-documented releases from the EPEC Wetland Dump.

### D.    The Offsite Facilities

62.     Just south of the confluence with Channel D, Crows Mill Creek flows past the EPEC Facility and Gredel Facility, each of which discharged hazardous substances into the Wetland.

63.     The data from Weston's investigations and EPEC's prior investigations indicate that the Wetland is contaminated with PCBs and BEHP that originated from the EPEC Facility, and that certain PCBs in the Wetland originated from the Gredel Facility.

64.     The data unequivocally establishes that all of the PCB and BEHP contamination within the Wetland south of Hatco AOC 25, and a significant portion of these contaminants within Hatco AOC 25, originated from the EPEC Facility and the Gredel Facility.

65.     In the most northern portion of the Wetland, directly downgradient from the Hatco Facility and within Hatco AOC 25—where the most significant impacts from the Hatco Facility would be expected given its relative proximity to the Hatco Facility—the data for PCBs (377 samples) and BEHP (196 samples) indicate a frequency of detection of 68% (PCBs) and 74% (BEHP), a median concentration of 1.0 ppm (PCBs) and 7.8 ppm (BEHP), an average concentration of 2.8 ppm (PCBs) and 421 ppm (BEHP), and a maximum concentration of 140 ppm (PCBs) and 21,000 ppm (BEHP), respectively.

66.     In stark contrast, in the middle portion of the Wetland—the area where the EPEC Facility discharged from its pond system as alleged herein—the data for PCBs (343 samples) and BEHP (441 samples) indicate a frequency of detection of 87% (PCBs) and 97% (BEHP), a median concentration of 3.2 ppm (PCBs) and 260 ppm (BEHP), an average concentration of 18.9 ppm (PCBs) and 1,977 ppm (BEHP), and a maximum concentration of 508 ppm (PCBs) and 58,000 ppm (BEHP), respectively.  (*See* Exhibit 2.)

14

67.     In addition, this middle portion of the Wetland also contains numerous other hazardous substances *not associated* with the Hatco Facility, including butylated hydroxytoluene ("**BHT**"), chlorotoluene, dichlorobenzene, benzaldehyde, and trichlorobenzene.

68.     As a direct and proximate result of releases of PCBs, BEHP, and other hazardous substances from the Offsite Facilities, Weston has incurred, and will incur, significant costs of response to remediate the releases of hazardous substances by the Defendants.

a)     **The EPEC Facility Historic Operations**

69.     The EPEC Facility (NJDEP PI# G000001659) was at one time a sprawling organic chemical manufacturing complex located on 250 acres north and south of Riverside Drive.  (*See* Exhibit 1.)  Active organic chemical manufacturing was conducted on the EPEC Facility south of Riverside Drive and adjacent/west of the Wetland on Block 93, Lots 100 series (formerly Block 62, Lot 2).

70.     The EPEC Facility consists of the former EPEC Polymers, Inc. facility comprised of both active manufacturing areas and hazardous waste disposal areas west of the EPEC portion of the Wetland, from which hazardous substances migrated to the Wetland, plus a designated hazardous substance liquids disposal area within the EPEC portion of the Wetland.

71.     The EPEC Facility also includes the former American Catalin Corporation, *a/k/a* Catalin Corporation of America and American Catalin Corporation facility (now known as Ashland, LLC and, collectively, referred to hereinafter as "**Ashland**"), which was located on and within the EPEC Facility and from which hazardous substances were transported to and released upon the EPEC portion of the Wetland.

72.     The following figure (also attached as **Exhibit 3**) depicts the EPEC Facility, the Gredel Facility, and the Hatco Facility:



INDUSTRIAL PROPERTIES MAP

73.     Between 1916 and 1985, the EPEC Facility used and manufactured a wide variety of heavily chlorinated organic compounds and phthalates to produce vinyl resins, herbicides, and a host of chlorinated intermediate chemicals.  Over at least a 40-year period, the EPEC Facility generated hazardous wastes, including Non-Aqueous Phase Liquids ("**NAPL**") containing PCBs, BEHP, BHT, chlorinated benzenes, chlorinated toluenes, and benzaldehyde, which it disposed in an on-site hazardous waste dump (the "**EPEC Northern Dump**") and in an adjacent liquid waste dumping area in the northwest corner of the Wetland (the "**EPEC Wetland Dump**").

74.     Both of these EPEC Facility hazardous waste disposal areas released hazardous substances to the Wetland.  PCBs, BEHP, and a host of other hazardous substances directly traceable to the EPEC Facility—including BHT, chlorobenzenes, and chlorotoluenes—migrated into the Wetland, and remain there today.

75.     The EPEC Facility began operations in 1916 as Norvell Chemical Corporation, which manufactured chemicals used in the production of phenolic resins and phenolic resin molding compounds, namely formaldehyde and hexamethylenetetramine.  Industrial wastes were handled via a pond system on the EPEC Facility—West Lake (the furthest western pond); (b) Middle Lake; and (c) Hartman's Pond (a 5-acre waterbody that was the furthest east pond and directly adjacent to the Wetland).

76.     The following figures (also attached as **Exhibit 4**) depict the EPEC Facility with the distribution of PCB and BEHP contamination in the Wetland:

**PCBs**



**BEHP**



77.     Over its 70 years of operation, ownership and/or responsibility, the EPEC Facility

changed hands many times: from Heyden Chemical Corporation (1926-1957), to Heyden-

Newport Chemical Corporation *a/k/a* Nuodex Products Company (1957-1963), to Tenneco

Chemical, Inc. (1963-1982), to Nuodex Corporation (1982-1984), to Hüls America (1984-1992),

and to EPEC (1992-present).  The Tenneco entities are collectively referred to hereinafter as

"**Tenneco**."  The Heyden entities, including Nuodex Products Company, are collectively referred

to hereinafter as "**Heyden**."

78.     The sale of the EPEC Facility from Nuodex Corporation to Hüls America in 1984

triggered an investigation of hazardous substance discharges under the Environmental Cleanup

Responsibility Act, the predecessor New Jersey cleanup statute to the current Industrial Site Recovery Act.  Upon information and belief, in 1992, due to extensive contamination, Hüls America and the former owner, Tenneco (now EPEC) *o/b/o* Nuodex Corporation (now associated with Nuodex, Inc.), reached an agreement whereby Tenneco took-back ownership of and remediation responsibility for the EPEC Facility.

79.     The EPEC Facility manufactured and/or used many of the same organic chemicals as the Hatco Facility, including phthalic anhydride (*a/k/a* phthalic acid), a precursor to phthalate esters used as plasticizers in polyvinyl chloride ("**PVC**") resins.  Phthalate esters, including BEHP, are derived from the reaction of phthalic anhydride with alcohols.

80.     For many years, the EPEC Facility manufactured phthalic anhydride and BEHP, which was used in PVC resins.  On or before July 1973, EPEC transferred the phthalic anhydride operation from the EPEC Facility to a sister plant in Burlington, New Jersey, which reported BEHP as a waste product present in plant sludge.

81.     The EPEC Facility also manufactured and/or used a wide variety of other products not made and/or used at the Hatco Facility, including dozens of highly-chlorinated organic compounds used as herbicides (weed killers), dyes, pharmaceuticals, mothproofing agents, germicides, fungicides, bactericides, and plastic resins.  Among the chemicals manufactured by the EPEC Facility were chlorotoluenes, polychlorinated camphene (branded Strobane, *i.e.* toxaphene), 2,4-Dichlorophenoxyacetic acid and 2,3,6-Trichlorophenylacetic acid (branded Tri-Fene), chlorobenzenes (including 2,3,6-trichlorobenzoic acid and 2,4 dichlorobenzoic acid), benzaldehyde (essential oils, flavorings, and insecticides), hydrochloric acid, benzotrifluoride (soaps), latex resins (branded "Supercryl"), formaldehyde (phenolic resins), benzene hexachloride ("**BHC**"), and BHT (antioxidant used in PVC resins, including

extensive use of BHT Ionol as an antioxidant stabilizer in the latex paint Supercryl and EPEC's PVC resins), among others.

82.   The EPEC Facility used significant quantities of BHT, which was an antioxidant additive in the Supercryl latex resin.  EPEC's other two New Jersey plastic resin plants—in Burlington and Flemington—also used BHT.

83.   The EPEC Facility employed two types of formaldehyde manufacturing processes: (a) a silver catalyst unit constructed in the 1930s with a very high reaction temperature of 600°- 650°C; and (b) a metal oxide catalyst unit constructed in the 1960s with a reaction temperature of 300°-400°C.

84.   The formaldehyde manufacturing processes and a wide variety of other thermal processes at the EPEC Facility required the use of heat transfer fluids.

85.   From time-to-time, the EPEC Facility experienced catastrophic thermal explosions, including fatal explosions in the boiler room on May 28, 1958, and in the benzaldehyde manufacturing area on March 7, 1968.

86.   Upon information and belief, the EPEC Facility extensively used and disposed of PCBs in a variety of its processes, including as heat transfer fluids, plasticizers, and dielectric fluids in electrical equipment.

87.   The EPEC Facility also used a product, Dowtherm A and G, containing biphenyls that generate PCBs when exposed to chlorine, which multiple EPEC Facility operations used in copious amounts.  Dowtherm A was also marketed as a replacement for PCB heat transfer fluids.

88.   In addition to its use of PCBs in connection with heat transfer fluids, plasticizers, and dielectric fluids, upon information and belief, the EPEC Facility also generated PCBs as a result of the byproducts of its various manufacturing processes that relied on the extensive use of

21

chlorine, toluene, benzene, 2,4 dichlorobenzoic acid, and phenolic resins, and in its use and/or manufacturing of BHC.

89.     The EPEC Facility's manufacturing of phthalic anhydride and BEHP, and its extensive use and indirect production of PCBs, resulted in the release of PCBs and BEHP from the EPEC Facility into the Wetland.

**b)      The EPEC Facility Operations of Ashland**

90.     At the western end of the EPEC Facility was another former organic chemical manufacturing facility, leased or owned and operated by Ashland (NJDEP PI# G000002706 and G000000448), located at Block 95, Lots 10.01, 10.02 (previously Block 95, Lots 10A, 10B), as depicted on Exhibits 1 and 3.

91.     Ashland began operations at the EPEC Facility around 1930, when it first leased facilities owned by Heyden.

92.     Ashland made cast phenolic resins, liquid phenolic resins, and polystyrene.  It manufactured phenolic resins using formaldehyde supplied by the EPEC Facility.

93.     Ashland also manufactured a variety of coal-tar-derived dyes to color its phenolic resins.

94.     Like EPEC and/or its predecessors, Ashland used a wide variety of thermal processes that required heat transfer fluids.  Ashland purchased PCB-containing heat transfer fluids from Monsanto.

95.     Ashland leased its land and buildings from EPEC's predecessor, Heyden, until 1952.

96.     Ashland shared much of its manufacturing infrastructure with the EPEC Facility, including the pond systems that received waste from both Ashland and other EPEC Facility operations.

97.     Upon information and belief, Ashland also used the EPEC Facility to dispose of its industrial wastes, including in the EPEC Northern Dump and in the EPEC Wetland Dump, where liquid wastes containing coal tar, PCBs, BEHP, BHT, 3,5-Di-tert-butyl-4-hydroxytoluene, 3,5-Di-tert-butyl-4-hydroxybenzaldehyde (BHT metabolite), 2-tertbutyl-4-methylphenol (aka "**MDPC**"), and Butane, 2-methoxy, 2-methyl ("**TAME**"), and other wastes generated by EPEC and/or Ashland were disposed.

98.     Based on Weston's extensive sampling and analysis of the concentration and distribution of PCBs, BEHP, BHT, 3,5-Di-tert-butyl-4-hydroxytoluene, 3,5-Di-tert-butyl-4-hydroxybenzaldehyde, MDPC, and TAME, in the Wetland, a substantial portion, if not all, of the contaminant mass is attributed to well-documented releases of these pollutants at and from the EPEC Facility either due to historic operations of EPEC and/or its predecessors or historic operations of Ashland.

99.     This conclusion is supported by multiple lines-of-evidence, which includes the co-extensive prevalence of other hazardous substances within the Wetland that are ***not associated*** with the Hatco Facility but were produced and/or used by EPEC and Ashland, including BHT, 3,5-Di-tert-butyl-4-hydroxytoluene, 3,5-Di-tert-butyl-4-hydroxybenzaldehyde, MDPC, and TAME.

### c)     The Gredel Facility

100.    Located directly east of the Wetland was the Gredel Facility, the former Twin Bridge Asphalt facility located on Block 61, Lot 1.01, formerly owned by Cardell, Inc.

("**Cardell**"), and now owned by Gredel (NJDEP PI #G000041281).  The Gredel Facility is

depicted on Exhibits 1 and 3.

101.    The Gredel Facility consists of the former asphalt and solid waste disposal facility

of Cardell, on land now owned by Gredel, to the east of the Wetland.

102.    The Gredel Facility operated an asphalt hot mix batch plant and a solid waste

disposal facility that accepted petroleum and PCB-contaminated soils, chemically-treated wood,

brick, concrete, metal, plastic, and electrical wiring.

103.    These operations released hazardous substances into both the EPEC portion of

Wetland and Gredel's own adjacent portion of Wetland to the south.

104.    The Gredel Facility conducted extensive filling of soils contaminated with PCBs

and other hazardous substances in the floodplain along the eastern bank of Crows Mill Creek.

105.    Among the wastes disposed of by the Gredel Facility was 300,000/cy of solid

waste accepted from Good Soil of New York derived from New York City demolition projects

that contained PCBs.

106.    The Gredel Facility also accepted and disposed of "**Kaofin**," a waste generated by

Marcal Paper Mills, Inc. ("**Marcal**"), containing a mixture of kaolin clay and byproducts of the

paper manufacturing industry, including PCBs and other hazardous substances.

107.    Based on the NJDEP administrative record and historical aerial photographs,

runoff from these operations resulted in hazardous substances being released into the Wetland,

including PCBs.

108.    Based on Weston's extensive sampling and analysis of the concentration and

distribution of PCBs in Wetland, a portion of the PCB contaminant mass is attributed to well-

documented releases of these pollutants at and from the Gredel Facility.

**E.**     **Weston's Response Costs Attributed to the Offsite Facilities**

   **a)**     **Weston's Wetland Investigation**

109.     As part of the Hatco Cleanup Agreement, Weston submitted a 2005 Consolidated Remedial Action Work Plan ("**2005 RAWP**") for the Hatco Remediation Site.

110.     This plan largely called for the excavation of relatively low levels of PCBs and BEHP in the sediments within the 200-foot segment of Channel D in the northern reaches of the EPEC portion of the Wetland.  In later submissions, Weston designated the area of proposed excavation as "Hatco AOC 25."

111.     However, NJDEP and USEPA have expanded the boundaries of the proposed remediation area over the years due to EPEC's misrepresentations about the nature and extent of its generation and disposal of PCB and BEHP wastes.

112.     A series of stormwater channels/drainage pathways were present adjacent to and within the southwestern portion of the Hatco Facility.  These were identified as Channels A, B, C, and D.  Channel D originates on the Hatco Facility, flows off-site to the west and under Riverside Drive, onto the EPEC portion of the Wetland.  It conveyed stormwater from Channels A, B and C, as well as discharges from the Hatco Facility settling pond system for a period of time.

113.     The 2005 RAWP identified a portion of Channel D in the Wetland as being part of the Hatco Remediation Site (*i.e.*, impacted by the Hatco Facility), and showed the path of the channel from the western portion of the Hatco Facility to the south beneath Riverside Drive to the Wetland.

114.     The 2005 RAWP proposed an excavation and limited capping remedy to address PCB and BEHP contamination in Channel D and, specifically, Channel D sediments.  Transport

and migration of PCB and BEHP contamination from the Hatco Facility via surface water was not a significant pathway.

115.     Nevertheless, to confirm the extent of Weston's proposed excavation and capping remedy, on September 25, 2006, Weston revised the 2005 RAWP to propose additional sampling of off-site areas.

116.     On September 26, 2006, the 2005 RAWP was approved by NJDEP, as amended. This RAWP approval required a Pre-Design Investigation Sampling Plan before a final remedial approach could be determined and approved by NJDEP and USEPA.

117.     Accordingly, Weston prepared a May 9, 2007 Sampling and Analysis Plan ("**2007 SAP**") to more fully investigate and delineate the extent of PCBs and BEHP in soil and sediment due to discharges from Channel D, without regard to the source of contaminants.

118.     Between 2007 and 2008, Weston, with the approval of NJDEP, implemented the 2007 SAP, including sampling in areas further south of Channel D.  Notably, the sampling team followed flowing water that deviated from the historical Channel D alignment into an area that was not historically a receiving area for water conveyed by Channel D.

119.     At a meeting on October 19, 2010, between Weston, NJDEP, USEPA, and EPEC, EPEC demanded that Weston expand the area of investigation beyond the 200-foot segment of Channel D, as provided in the 2005 RAWP.

120.     Specifically, EPEC demanded that Weston investigate an area of elevated PCB and BEHP concentrations along the western boundary of the Wetland previously detected by EPEC.  This area is located near the former outfall from the EPEC Facility's Hartman's Pond—the location where Hartman's Pond discharged into the Wetland.

121.    As a result of the meeting, NJDEP and USEPA directed Weston to delineate the full extent of PCBs and BEHP in the entire Wetland south of Riverside Drive, inclusive of Channel D and beyond, regardless of the source.

122.    NJDEP and USEPA took this action despite Weston's objection that the agencies were requiring it to unilaterally delineate contamination that did not originate from the Hatco Facility and without regard to other responsible parties.

123.    Thereafter, at substantial cost, Weston completed a multi-year delineation of hazardous substances within the entirety of the Wetland.

124.    Weston's delineation activities from the 2007 SAP through 2020 are collectively referred to as the "**Wetland Investigation**."

125.    The Wetland Investigation unequivocally establishes that the sources of PCB impacts to the Wetland are *unrelated* to migration of contaminants from the Hatco Facility, as follows.

126.     In 2011-2012, Weston implemented a January 2011 Revised Channel D Sampling and Analysis Plan on the EPEC Facility, and identified PCBs and BEHP at the Hartman's Pond outfall from the EPEC Facility and in the area south of the EPEC Facility.

127.    In 2014, Weston implemented a February 2014 Channel D Field Sampling Program on the Gredel Facility and further south on Block 77, Lot 100.01 owned by Woodbridge Township.  Weston did not identify PCBs south of the Gredel Facility, but it did identify BEHP on the Woodbridge portion of the Wetland.

128.    In August 2017, at NJDEP's additional request, Weston performed further confirmation sampling of sediment on the Woodbridge portion of the Wetland to verify delineation of the BEHP to the furthest downstream point, without regard to source.

129.    In August and December 2020, Weston conducted sampling and resampling of the EPEC portion of the Wetland pursuant to a Supplemental Sampling Plan, as amended, to determine the full extent of potential sources of PCB and BEHP in the Wetland.

130.    In total, the Wetland Investigation encompassed more than 1,000 soil and sediment samples, and confirmed that:

    a.    **Hazardous substances from the Hatco Facility are limited to the area identified as Hatco AOC 25**;

    b.    **A portion of the hazardous substances detected in Hatco AOC 25 originated from the Offsite Facilities**; and

    c.    **All of the PCB and BEHP contamination, plus other hazardous substances, south of Hatco AOC 25 in the Wetland originated from the Offsite Facilities**.

131.    The Wetland Investigation has concluded Weston's review of potential southern migration of Hatco Facility contaminants in sediments through surface water channels.

132.    Weston identified PCBs and BEHP throughout the Wetland, and identified various sources of discharges originating not from the Hatco Facility, but from the Offsite Facilities owned and/or operated by the Defendants.

133.    The Wetland Investigation indicates that PCBs and BEHP in soil and sediment have been delineated well past the point where Hatco Facility contaminants have come to be located.  The PCBs and BEHP detected in the soil and sediment of Crows Mill Creek and the floodplain south of Channel D clearly originate from the Offsite Facilities, and associated releases from the historical operations of the Offsite Facilities—for which Weston bears no responsibility.

134.    The following figure (also attached as **Exhibit 5**) depicts the flows of hazardous substances from the Hatco Facility (*i.e.*, flow from Channel D and the Crows Mill Creek into

28

Hatco AOC 25), the EPEC Facility, and the Gredel Facility, as determined by the Wetland

Investigation and described in detail herein:



135.    Investigation results conclude that the following tracer compounds in the Wetland

(the "**Tracer Compounds**") are non-Hatco Facility contaminants attributed to releases from

other parties and other manufacturing processes:

a.    **EPEC Facility:  BHT, Butane, TAME, 3,5-Di-tert-butyl-4-hydroxybenzaldehyde, 3,5-Di-tert-butyl-4-hydroxytoluene, 2-tertbutyl-4-methylphenol;[2] and**

---

[2] This includes compounds attributed to the historic operations of both EPEC and/or its predecessors and Ashland.

b. **Gredel Facility:  C20H12, a polycyclic aromatic hydrocarbon.**

136.   Analysis (including statistical analysis) of the sampling results from the Wetland Investigation for the Tracer Compounds indicates that all of the PCBs and BEHP in the Wetland (other than Hatco AOC 25) originate from the Offsite Facilities and not the Hatco Facility.

137.   The concentration profiles of PCBs and BEHP in the Wetland and associated distribution modeling (otherwise known as a Kriging analysis) indicate that all of the PCBs and BEHP in the Wetland (other than Hatco AOC 25) originate from the Offsite Facilities and not the Hatco Facility.

138.   On October 4, 2021, Weston's Licensed Site Remediation Professional submitted a Confirmed Discharge Notification to the NJDEP (Incident # 21-10-04-1358-29) notifying NJDEP that the PCBs, BEHP, and other hazardous substances detected in the Wetland beyond approximately 350 feet south of Riverside Drive originated from the Offsite Facilities.

139.   To date, Weston has spent around $3 million in response costs to implement the Wetland Investigation.

140.   To date, EPEC and Gredel have not paid any response costs incurred by Weston for the Wetland Investigation.

141.   Despite the fact that the 1-acre Hatco AOC 25 impacts is just a fraction of the Wetland, USEPA and NJDEP have asserted that Weston is responsible for the entirety of the approximately 26-acre Wetland.

142.   However, all of the impacts to the Wetland outside of Hatco AOC 25 are due to discharges from the Offsite Facilities.

143.     But for the discharges from the Offsite Facilities, those portions of the Wetland would not require any remediation because they would be below applicable NJDEP and EPA remediation standards.

**b)      Weston Pays for EPEC's Disposal of PCB Debris**

144.     In addition to the Wetland Investigation, Weston's response to the pollution conditions in the Wetland, to date, includes paying for the disposal of PCB contaminated debris generated by EPEC's remediation of lead contamination in the elevated railroad berm adjacent to the EPEC Northern Dump at the EPEC Facility.

145.     Prior to the chemical operations at issue in this Complaint, many of the same parcels were involved with clay mining.  The miners used railroads as part of their mining operations.

146.     An elevated former railroad line constructed on a berm running north-to-south is located in the eastern part of the EPEC Facility east of Hartman's Pond.  This berm divided the active EPEC Facility operations from the EPEC portion of the Wetland, as depicted in Exhibit 4.

147.     Although the elevated railroad berm was no longer used by rail cars, aerial photographs dating back to at least 1954 confirm that EPEC Facility personnel continued to use the old railroad berm to transport industrial wastes via truck to the EPEC Northern Dump and to the EPEC Wetland Dump.

148.     These photographs also show that the EPEC Facility filled areas adjacent to the berm in each of the two dumping areas to provide turn-around space for trucks using the berm to transport EPEC Facility wastes to these dumps.  The fill material used to create the turn-around space contained lead contaminated battery carcasses.

149.     **Exhibit 6** is a series of aerial photographs of the EPEC Facility, including photographs from 1947, 1954, 1957, 1966, 1970, and 1979.

150.     The following 1954 aerial photograph shows the EPEC Facility railroad berm, inclusive of filled areas adjacent to the berm by the EPEC Northern Dump and the EPEC Wetland Dump:



(Exhibit 6.)

151.    The following 1979 aerial photograph shows the turn-around space by the EPEC Northern Dump and the location where the lead contaminated battery carcasses were removed from:



(Exhibit 6.)

152.     During the course of EPEC's remediation of the lead contamination in 2012, EPEC found PCBs intermixed with the lead contamination, on both sides of the old clay mining railroad berm.

153.     Notwithstanding the physical impossibility of Hatco Facility contaminants migrating to the opposite (west) side of the elevated railroad berm, EPEC represented to NJDEP that the PCBs detected in the lead contamination area originated from the Hatco Facility via Channel D.

154.     At the time, Weston agreed to pay for offsite disposal of the PCB waste generated from EPEC's remediation of the lead contamination based on incomplete information and EPEC's misrepresentation that the PCBs did not originate from the EPEC Facility.

155.     However, Weston's subsequent desktop assessment of the historical chemical manufacturing operations at the EPEC Facility, including analysis of aerial photographs, chemical usage, and other salient features, confirmed that the PCBs found in the lead battery disposal area originated from the EPEC Facility and not the Hatco Facility.

156.     This conclusion is based on multiple lines-of-evidence, including the: (a) distribution of PCBs and BEHP in the Wetland; (b) historical PCB migration pathways; (c) historical operations of the EPEC Facility that involved extensive use of PCBs and other highly-chlorinated compounds that transform into PCBs; and (d) confirmation of multiple other Tracer Compounds in the vicinity of the berm area associated with EPEC Facility operations and not those of the Hatco Facility.

157.     Weston incurred response costs of $31,400 to dispose of PCB detected in EPEC's lead contaminated berm area.

158.     This response cost, in addition to the around $3 million for the Wetland Investigation, were and/or are necessary to address the release and/or threatened releases from the Offsite Facilities; are required to develop a final remedial approach for the Wetland (to the extent of Weston's obligation to remediate Hatco AOC 25); and are consistent with the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and amendments thereto (the "**NCP**").

159.     Weston will likely continue to incur response costs to conduct response actions at the Wetland as required by USEPA and NJDEP absent a Court Order limiting and/or apportioning its liability.

## V.     HAZARDOUS SUBSTANCE RELEASES FROM OFFSITE FACILITIES ONTO THE WETLAND

### A.     EPEC Facility Generation of PCBs, BEHP, and Other Wastes

160.     Extensive use of PCBs, BEHP, and other hazardous substances by the EPEC Facility, inclusive of the Ashland operations, is evidenced by historical documents and the multiple areas within the EPEC Facility where elevated concentrations of these hazardous substances have been detected in soil, sediment, and groundwater.

#### a)     EPEC and/or its Predecessors' Operations Generated PCBs, BEHP, BHT, and Other Hazardous Substances

161.     The EPEC Facility manufactured a multitude of organic chemicals from at least 1916 to 1985, many of which belong to the following categories of compounds: (1) carboxylic acids, associated salts, and chlorinated carboxylic acids; (2) aldehydes and chlorinated aldehydes; (3) ketones; (4) organic herbicides and insecticides; (5) chlorinated aliphatics and aromatics; and (6) muriatic acid.

162.    A 1967 report by the Federal Water Pollution Control Administration

("**FWPCA**") and the U.S. Department of the Interior (the predecessor to USEPA) documents

that the EPEC Facility manufactured organic intermediate chemicals comprising over 200 final

products, with major products including:

a.  Strobane (chlorinated terpene);
b.  Hexamethylene tetramine (used in resins and explosives);
c.  Pentaerythritol (used in paint);
d.  Maleic anhydride (used in resins);
e.  Phthalic anhydride (used as plasticizer);
f.  Chlorotoluene (used in herbicides and drugs);
g.  Benzaldehyde (essential oils used in flavorings and insecticides);
h.  Hydrochloric acid;
i.  Formaldehyde; and
j.  Benzotrifluoride.

*See* FWCPA, "*Conference: Pollution of Raritan Bay and Adjacent Interstate Waters, Third*

*Session, NYC June 13-14, 1967*," Vol. 2  ("**1967 Raritan Bay Report**").

163.    Upon information and belief, the chemical manufacturing processes at the EPEC

Facility involved various heat transfer systems that used heat transfer fluids containing PCBs.

These products stopped being produced in the United States in or around 1970 and were banned

in 1979 pursuant to Section 6(e) of Toxic Substances Control Act.  PCB products manufactured

by Monsanto were replaced by Dowtherm products, known to have been stored and used at the

EPEC Facility.

164.    The EPEC Facility also employed dozens of transformers and capacitors that

contained PCBs throughout its manufacturing operations, and which were spilled throughout the

facility.

165.    In addition, upon information and belief, the chemical manufacturing processes at

the EPEC Facility created PCBs indirectly by way of chlorination.  It is well-established that

PCBs are readily produced as byproducts of the manufacturing of various chlorinated organic

36

compounds, including 2,4 dichlorobenzoic acid, 2,3,6-trichlorbenzoic acid, dyes and organic

pigments, and a variety of other chlorinated compounds the EPEC Facility made for many years.

166.    In 1981, EPEC submitted a Pretreatment/Residual Waste Survey to the MCUA

(the "**1981 Survey**").  The survey indicated that EPEC manufactured cyclic crudes and cyclic

intermediates, dyes and organic pigments, and pesticides and agricultural chemicals.  EPEC

represented that it generated 3.7 tons of PCB waste material per year in the 1981 Survey.

167.    The EPEC Facility's operations also resulted in extensive releases of BEHP, other

phthalate esters, and a variety of other contaminants that contaminated groundwater beneath the

facility with BEHP, 4-dimethylphenol, 2-chlorotoluene, 4,4'-DDD, 4-chlorotoluene and Alpha-

BHC, several metals, benzene, beta-BHC, chlorobenzene, methyl ethyl ketone, methylene

chloride, chloroform, chloride, and sulfate.

168.    The EPEC Facility manufactured and/or used significant quantities of BEHP,

which EPEC produced from the manufacture of phthalic anhydride and other phthalate esters.

The EPEC Facility used BEHP as a plasticizer in the manufacture of PVC resins until the 1970s.

169.    Phthalic anhydride is a principal commercial form of phthalic acid, an industrial

chemical used in the large-scale production of plasticizers for plastics.  The primary use of

phthalic anhydride is a precursor to phthalate esters, which are used as plasticizers in PVC resins.

Phthalate esters, including BEHP, are derived from phthalic anhydride by the alcoholysis

reaction, which relies upon the reaction of phthalic anhydride with alcohols to produce the

diester, BEHP.

170.    In addition, the EPEC Facility manufactured and/or used significant quantities of

BHT in the production of PVC resins, including in the "Supercryl" latex resin manufactured at

the EPEC Facility.  BHT, including the brand "Ionol," was added to the resin as an antioxidant stabilizer.

171.    In 1981, at least 494,000 tons of aqueous waste (*i.e.*, sludge) from onsite departments was received at onsite wastewater basins that were built on the southern portion of the EPEC Facility (*i.e.*, sludge lagoons).  The sludge contained organic and inorganic contaminants, including but not limited to formaldehyde, methanol, benzene, xylene, maleic anhydride, formic acid, maleic acid, phenol, metals, petroleum hydrocarbons, 1,2-Dichlorobenzene, 1,4-Dichlorobenzene , and 1,2,4-Trichlorobenzene.

172.    The EPEC Facility's former sludge lagoons are depicted in Exhibit 4.

173.    Although EPEC did not test the sludge for PCBs or BEHP, both of these hazardous substances were detected in samples of groundwater collected downgradient from the sludge lagoons.  This strongly suggests that the sludge contained high concentrations of both compounds, as they are both relatively insoluble in groundwater.

174.    In January 1982, Geraghty & Miller, a consultant for EPEC's predecessor Nuodex Corporation, collected shallow groundwater samples in the sludge disposal area south of the sludge lagoons and in the area of the settling ponds that handled facility process wastewater.

175.    Groundwater was contaminated with PCBs at concentrations 62 times above NJDEP groundwater quality standards.  Groundwater adjacent to the sludge disposal area contained PCBs at 31.7 ug/l.  Groundwater adjacent to the settling ponds contained PCBs at 5.69 ug/l.

176.    Groundwater beneath multiple areas of the EPEC Facility is also contaminated with BEHP, including at the former Area S-2 (pesticide manufacturing adjacent to the Ashland

operations) (875 ug/L), Pentek manufacturing area (Building 30) (160 ug/L), and the sludge lagoons (140 ug/L).

177.    Because PCBs and BEHP are mostly insoluble in water, the fact that these hazardous substances were detected in groundwater at these elevated levels confirms that EPEC Facility sludge contained high levels of PCBs and BEHP, which further suggests extensive use of these hazardous substances by the EPEC Facility.

178.    In addition, sediment in West Lake, Middle Lake, and Hartman's Pond are heavily contaminated with BEHP (up to 4,600 mg/kg), plus chlorotoluenes, benzaldehyde, formaldehyde, and a variety of other compounds associated with the EPEC Facility and the former Ashland operations.

179.    EPEC has contended that PCBs, BEHP, and other contaminants detected in Middle Lake and West Lake originated from the Hatco Facility.  EPEC alleges that these hazardous substances migrated from Woodbridge Pond (a pond located adjacent (west) to the Hatco Facility), along a ditch paralleling the northern edge of Riverside Drive, and then through a culvert beneath the roadway into Middle Lake, a distance of approximately 1,100 feet.  This contention is false for multiple reasons, including that surface water from Woodbridge Pond flows from west-to-east and discharges into the Wetland via Channel D.

180.    In the 1960s, the EPEC Facility relocated the pesticide manufacturing operations conducted in Area S-2 to Building 49 located on the southern shoreline of Hartman's Pond. There it manufactured dichlorobenzaldehydes, benzoic acid, trichlorobenzoic acid, parachlorobenzoic acid, parachlorobenzotrichloride, 2,4-dichloro benzoyl chloride, ortho & para chloro benzoyl chloride, salicylsalicylic acid, Guaiacol C, and Nuosept 95.

181.     On March 7, 1968, the benzaldehyde manufacturing area experienced a catastrophic explosion, which caused additional releases of hazardous substances into Hartman's Pond and the Wetland.

182.     Over its nearly 70 years of operation, spillage and leakage of PCBs, BEHP, and BHT from EPEC Facility operations released these hazardous substances and other wastes into Hartman's Pond and the Wetland.

183.     The EPEC Facility also directly disposed of wastes containing these hazardous substances into the EPEC Northern Dump and the EPEC Wetland Dump, which further contaminated the Wetland.  (*See* Exhibit 5.)

184.     EPEC is responsible for hazardous substances that have come to be located on the Wetland through pathways set forth below.

         **b)     Ashland's Operations Generated PCBs, BEHP, and Other Hazardous
                  Substances**

185.     The western portion of the EPEC Facility formerly operated by Ashland was used to manufacture a wide variety of organic chemicals, including phenolic and acrylic resins, and, upon information and belief, antioxidants (including BHT), ortho and para chlorobenzoic acid, benzotrichloride, benzyl alcohol, BEHP, and coal-tar derived dyes used as colorants in various Catalin phenolic resins.

186.     Ashland's chemical manufacturing processes used various heat transfer fluids containing PCBs, as confirmed by Monsanto's records.

187.     In addition, Ashland owned and operated transformers and capacitors containing PCBs.

188.     Samples of the groundwater near the western edge of the former pesticide production area, Area S-2, adjacent to the Ashland operations as depicted on Exhibit 4, detected

up to 875 ug/L BEHP, which is more than three orders of magnitude greater than the current

New Jersey standard.  This pesticide production area on the EPEC Facility borders former

Ashland operations.  Elevated BEHP concentrations also are found in West Lake, Middle Lake,

and Hartman's Pond.

189.    To date, known groundwater impacts on the portion of the EPEC Facility

formerly operated by Ashland include the following compounds: BEHP, benzene,

chlorobenzene, tertiary butyl alcohol, toluene, metals and PAHs in historical fill, 1,2-

dichloroethane, acetone, methyl ethyl ketone, chloroform, phenols, formaldehyde, 1,2-

dichloroethane, pentachlorophenol, and phenanthrene.

190.    To date, known soil impacts on the portion of the EPEC Facility formerly

operated by Ashland include the following compounds: PCBs, BEHP, benzo(a)anthracene,

benzo(a)pyrene, benzo(b)fluorene, benzo(k)fluoranthene, dibenz(a,h)anthracene, 2,6-

Dinitrotoluene, Indeno(1,2,3-cd)pyrene, metals (including antimony, arsenic beryllium, lead,

chromium, and mercury), toluene, pentachlorophenol, chrysene, dieldrin, formaldehyde,

butylated hydroxytoluene, MBPC, methylene chloride, xylenes, benzene, methyl ethyl ketone,

mercury, diisobutylene, and total petroleum hydrocarbons.

191.    The EPEC Facility facilitated and otherwise allowed the migration of these

hazardous wastes into the Wetland as set forth below.

**B.    EPEC Facility Stormwater/Wastewater Migration of Hazardous Substances**

**a)    Historic West to East Flow from Hartman's Pond to the EPEC portion of the Wetland**

192.    The EPEC Facility discharged stormwater and process water into Hartman's

Pond, a 5-acre pond with an outfall discharging into the Wetland about 700 feet south of

Riverside Drive, as depicted on Exhibits 4 and 5.

41

193.     Historically, the flow of stormwater and wastewater from Hartman's Pond was directed west to east into the Wetland.

194.     Extending south from Riverside Drive along the eastern boundary of Hartman's Pond and the EPEC Facility manufacturing area was the old elevated railroad berm, a vestige of the former clay mining in the area.

195.     The elevated railroad berm divided the eastern boundary of the EPEC Facility manufacturing area from the Wetland to the east, and was a surface barrier to the overland flow of contaminants between the EPEC Facility and the adjacent EPEC portion of the Wetland, except in those places where the berm was breached.

196.     Hartman's Pond had an outfall channel beneath the old railroad berm that drained into the EPEC portion of the Wetland and Crows Mill Creek, as depicted on Exhibit 4.

197.     The 1967 Raritan Bay Report documents that EPEC Facility "cooling water" carried a heavy pollutant load of chlorinated hydrocarbons that discharged into the Raritan River.

198.     This report further documents that the EPEC Facility discharged process wastewater to leaching fields, and that four cooling towers used in the production of hexamethylene tetramine, pentaerythritol, benzaldehyde, strobane, and chlorotoluene discharged cooling water and carry-over of the product into West Lake.

199.     As described more fully below, multiple areas at the EPEC Facility were subsequently found to be impacted with NAPL, including West Lake, the Wetlands Ditch, the northwestern corner of EPEC's Northern Dump, EPEC's Wetland Dump, the southwestern corner of Hartman's Pond, and the former manufacturing areas as depicted on Exhibit 4.

200.     Contaminants in West Lake carried over into Hartman's Pond and, ultimately, the Wetland via historic west to east flow at the EPEC Facility.

201.    Aerial photographs document that historical operations at the EPEC Facility resulted in surface water discharges of wastewater from manufacturing facilities and the EPEC Northern Dump into Hartman's Pond west of the Wetland, which then discharged via the historic outfall channel directly to the Wetland.

202.    This historic west to east flow of surface and wastewater discharges contained PCBs, BEHP, and other hazardous substances, which entered the Wetland through the Hartman's Pond outfall.

**b)     The 1966 Hartman's Pond Drainage Event**

203.    Before the creation of NJDEP, the U.S. Army Corps of Engineers ("**USACE**") and the New Jersey Department of Health ("**NJDOH**") had statutory authority to address industrial pollution discharges to certain waters.  The USACE had primary jurisdiction pursuant to the Rivers and Harbors Act of 1899 (*a/k/a* The Refuse Act of 1899) to enjoin industrial waste discharges into navigable waters.  The NJDOH had jurisdiction pursuant to the State Health Code to address industrial waste threatening public health.

204.    In 1964, NJDOH ordered the EPEC Facility to cease discharging industrial wastewater to Crows Mill Creek, via Hartman's Pond, by August 30, 1964.

205.    The EPEC Facility did not comply with the NJDOH directive.  In 1967, the Office of the New Jersey Attorney General, on behalf of NJDOH, filed an Order to Show Cause against the EPEC Facility for chronic discharges of industrial waste into West Lake and Crows Mill Creek.

206.    Aerial photographs confirm that, beginning in 1966, the EPEC Facility undertook a project to raise the elevation of Hartman's Pond relative to Middle Lake and West Lake, thereby reversing the flow direction and eliminating the direct discharge into Crows Mill Creek.

207.    The EPEC Facility accomplished this by digging a series of ditches to drain the contents of Hartman's Pond into the EPEC portion of the Wetland.  It then raised the elevation of the pond and its outfall.

208.    The following December 4, 1966 aerial photograph shows that EPEC Facility had completely drained the fluid out of Hartman's Pond and had dug a series of ditches to accelerate the draining into the Wetland:



(Exhibit 6.)

209.    The project successfully reversed the prevailing flow from west to east (so that it was now east to west), away from Crows Mill Creek, and thereby avoided USACE jurisdiction

over the EPEC Facility's ongoing pollution discharges from Hartman's Pond to Crows Mill Creek—a "navigable water" subject to the Refuse Act of 1899.

210.    The rapid draining of Hartman's Pond in 1966 caused entrained sediment and associated contaminants adsorbed on the sediment, including NAPL, to drain into the Wetland.

211.    By draining the entire contents of Hartman's Pond into the Wetland (including sediment and NAPL), the EPEC Facility released large quantities of hazardous substances, including PCBs and BEHP, that had accumulated in the pond and its sediments over the previous 50 years of industrial waste discharges.

212.    Concentrations of PCB and BEHP contamination in the central portion of the Wetland, at the location where Hartman's Pond discharged and EPEC dug the drainage ditches, are several orders-of-magnitude higher than in Hatco AOC 25 in the northern portion of the Wetland, where contaminants from the Hatco Facility settled out.  This distribution pattern of PCB and BEHP is depicted in Exhibits 2 and 4.

213.    The EPEC Facility also discharged hazardous substances into the Wetland through conveyances other than Hartman's Pond, including through channels south of Hartman's Pond, a cut in the old elevated railroad berm of a small lagoon (Wilcox Pond), and the Wetlands Ditch, which emptied into Crows Mill Creek at the southern boundary of the EPEC Facility.

### C.    Dumping of Hazardous Substances at the EPEC Facility

214.    From before 1947 to at least 1995, on the northern shore of Hartman's Pond, between Riverside Drive and the pond, the EPEC Facility owned and operated a 4-acre industrial waste landfill, the aforementioned EPEC Northern Dump, as depicted on Exhibit 4.

215.    The eastern boundary of the EPEC Northern Dump was the elevated berm for the old north-south clay railroad.

216.    The EPEC Northern Dump was accessible by truck off the elevated old clay railroad berm and Riverside Drive, and by rail off the rail spur used to transport chemicals in and out of the EPEC Facility, including the Ashland manufacturing area.

217.    The EPEC Facility disposed of wastes from plant operations in the EPEC Northern Dump, including liquid wastes and NAPL, which drained into Hartman's Pond and then into the Wetland.  (*See* Exhibit 5.)

218.    In addition, at the northeastern corner of the EPEC Northern Dump, where the dump met the old railroad berm, EPEC operated another liquid waste disposal area that was located in the Wetland just on the east side of the old elevated railroad berm—the aforementioned EPEC Wetland Dump.  EPEC refers to the EPEC Wetland Dump as EPEC AOC 4.

219.    The extent of the residual NAPL placed in the EPEC Wetland Dump is still present today.  It is located just 50 feet west, and upgradient of, Channel D on the EPEC portion of the Wetland, as depicted on Exhibit 2.

220.    The EPEC Facility disposed of wastes from plant operations in the EPEC Wetland Dump, including liquid wastes and NAPL, which has migrated in and throughout Wetland, including into Channel D, as a result of natural drainage patterns.  (*See* Exhibit 5.)

    a)    **Releases to the EPEC Northern Dump Flowing to Hartman's Pond**

221.    For over 20 years, the EPEC Northern Dump operated as a source for hazardous substances released to and through the Hartman's Pond outfall into the middle portion of Wetland, as indicated by aerial photographs.

222.    The following 1947 aerial photograph confirms that the EPEC Northern Dump was operating well before 1947 and that a large plume of contamination from the dumping area was impacting Hartman's Pond and the Wetland:



(Exhibit 6.)

223.    By 1947, a large circular area (estimated to be at least 60 feet in diameter) of waste disposal just off the EPEC Facility rail spur is clearly evident.  Migration of liquid waste is

clearly visible, and it extends more than 600 feet south from the EPEC Northern Dump disposal area all the way down to and across Hartman's Pond.

224.    The 1947 aerial photograph also shows an elongated discolored area extending from the Hartman's Pond outfall to the east.

225.    The aforementioned 1954 aerial photograph shows continued expansion of the EPEC Northern Dump, an adjacent liquids disposal pit, and large plume of contamination flowing from the dumping area to Hartman's Pond.  (*See* Exhibit 6, 1954 photograph.)

226.    The following 1957 aerial photograph shows that, 10 years later, the area of waste disposal in the EPEC Northern Dump has grown substantially to a diameter of more than 200 feet:



(Exhibit 6.)

227.    In 1996, EPEC finally closed the EPEC Northern Dump.  However, the EPEC

Northern Dump was confirmed to contain a host of EPEC Facility contaminants, including PCBs

(later discovered on the periphery), BEHP, acetone, chloroform, 1,2-Dibromo-3-chloropropane,

chlorotoluenes, 1,2-Dichlorobenzene and 1,4-Dichlorobenzene, 1,2,4-Trichlorobenzene,

benzaldehyde, tetrachlorobenzene, 2,4-dichlorophenol, 2-methylphenol, 3&4-methylphenol,

tetrachlorophenol, phenol, pentachlorophenol, tri- and tetra-chlorophenols, acetophenone, anthracene, PAHs, 1,1'-biphenyl,  naphthalene, phenanthrene, pyrene, chloro hydroxy benzaldehydes, benzyl alcohol, chlorobenzoic acids, trichloromethylbenzenes, salicylic acid, toxaphene, mercury, and lead.

228.   Solid and/or liquid wastes disposed into the EPEC Northern Dump migrated to Hartman's Pond and its outfall into the Wetland.  (*See* Exhibit 5.)

### b)   Discharges to the EPEC Wetland Dump

229.   For over 25 years, the EPEC Wetland Dump served as yet another source of hazardous substances in and throughout Wetland, as evidenced by the aerial photographic record. (*See* Exhibit 5.)

230.   The aforementioned 1954 aerial photograph clearly shows the EPEC Wetland Dump on the eastern side of the old railroad berm is already well-established, thus confirming its operation well before 1954. (*See* Exhibit 6, 1954 photograph.)

231.   The aforementioned 1957 aerial photograph clearly shows the EPEC Wetland Dump on the eastern side of the old railroad berm has extended further south, with an elongated teardrop of denuded vegetation extending more than 100 feet to the south from the northwest corner of the EPEC Wetland.  (*See* Exhibit 6, 1957 photograph.)

232.   The denuded vegetation is evidence that herbicides manufactured at the EPEC Facility was disposed in this area.

233.   The aforementioned 1979 aerial photograph shows that dumping formed a large NAPL plume in and across the Wetland.  (*See* Exhibit 6, 1979 photograph.)

234.   EPEC estimated that the quantity of NAPL disposed of in the EPEC Wetland Dump was only 100,000 gallons.  However, the actual amount of liquid waste dumped in this area of the EPEC Facility (including NAPL and non-NAPL liquids) was likely at least an order

of magnitude higher (*i.e.*, 1,000,000 gallons or more), based on the length of the time during which the dumping took place (more than 25 years), the wide geographical extent of the denuded wetland vegetation, and the flow structures evident on aerial photographs from that timeframe.

235.   At EPEC's urging, NJDEP directed Weston to collect soil and sediment samples from the EPEC Wetland Dump (EPEC AOC 4), which detected the following compounds: PCBs, BEHP, total petroleum hydrocarbon, lead, benzene, various dichlorobenzenes, 1,2,4-Trichlorobenzene, hexachlorobutadiene, 2,4-dimethylphenol, PAHs, 4-CT, 4,4-DDT, 2-methylphenol, 3&4 methylphenol, BHT and BHT isomers and related antioxidant compounds such as di-tert-butyl-hydroxybenzaldehyde and 4,4-ethylenebis(2,6-di-tert-butylphenol), 3,5-di-tert-butyl-4-hydroxybenzaldehyde, dimethyl phenol isomers, tetrachlorothiophene (a pesticide), 1,2,3-TCB, Fuel Oil No. 6, benzene, ketones, di- and tri-chlorobenzenes, tetrachlorobenzene, PAHs (including fluorene, fluoranthene, phenanthrene, anthracene, chrysene, and pyrene), naphthalenes (including naphthalene, 2-methylnaphthalene, and 1-methylnaphthalene), phenol, cresols, 2,4-dimethylphenol, nonylphenol, and chlorotoluenes.

236.   Based on the 1979 aerial photograph, the NAPL plume extended nearly 600 feet south to the discharge outfall from Hartman's Pond (*i.e.*, the middle portion of Wetland.  (*See* Exhibit 6, 1979 photo.)

237.   The extent of the dumping became so large it extended to the east into the area of Hatco AOC 25.

238.   Sampling and analysis of the soils and NAPL directly at the EPEC Wetland Dump (west of the Hatco-associated Channel D) detected elevated concentrations of PCB Aroclor 1248, PCB Aroclor 1254, and BEHP at levels which are significantly higher than in Hatco AOC 25.

239.     Sampling and analysis of the soils and NAPL directly at the EPEC Wetland
Dump also detected several other hazardous substances that are not associated with the Hatco
Facility (*i.e.*, an insignificant or non-existent compound), including lead, PCB Aroclor 1242 PCB
Aroclor 1260, chlorinated benzenes, chlorotoluene, hexachlorobutadiene, 4,4'-DDT, and BHT,
among others.

240.     All of the hazardous substances detected within the EPEC Wetland Dump are
contaminants known to have been generated by the EPEC Facility, including: (a) BHT, which
EPEC used in its PVC resins, including its Supercryl latex resin; (b) BEHP, which EPEC
produced and/or used in the manufacture of phthalate esters (a plasticizer) using phthalic
anhydride; and (c) PCBs, which EPEC used in heat transfer fluids and also generated indirectly
from the byproducts of its various chlorinated manufacturing processes, including its
manufacture of 2,4 Dichlorobenzoic acid, 2,3,6-Trichlorbenzoic acid, 2,4-Dichlorophenoxyacetic
acid and 2,3,6-Trichlorophenylacetic acid and a variety of other chlorinated compounds.

241.     The hazardous substances found in the EPEC Wetland Dump were used and/or
generated by the historical chemical manufacturing processes at the EPEC Facility and were
discharged to the surrounding area in the EPEC portion of the Wetland and further downstream
throughout the Wetland as a result of natural flow.

242.     The hazardous substances detected within the EPEC Wetland Dump are the
responsibility of EPEC, the owner and operator of the EPEC Facility on which open and obvious
NAPL dumping occurred for more than 25 years either due to its and/or its predecessors'
operations or the operations of Ashland as former lessee of portions of the EPEC Facility.

**D.     EPEC Facility Discharges of Hazardous Substances in Manufacturing Areas**

243.     In addition to the combined waste migration and dumping of hazardous
substances at the EPEC Facility that migrated into the Wetland (as evidenced by sampling and

52

aerial photographs), sampling in production areas, sampling from leaking drums, and incidents involving leaking capacitor oil all document PCB discharges to soil on the former and active manufacturing areas of the EPEC Facility—west of the Wetland and separated by the rail berm.

244.    Upon information and belief, these documented releases of PCB wastes came to be located on the Wetland via both the historic west to east flow into and through the Hartman's Pond outfall and disposal in the EPEC Northern Dump and in EPEC Wetland Dump.  (*See* Exhibit 5.)

245.    In 1985, sampling and analysis of soils in the historical chlorinated pesticide production area at the EPEC Facility revealed concentrations of PCB Aroclor 1248 of 16,000 mg/kg and 17,000 mg/kg, both three orders-of-magnitude higher than what EPEC noted in the Deed Notice for the EPEC Facility.  The chlorinated pesticide production area is depicted in Exhibit 4.

246.    The levels in the pesticide production area are indicative of a substantial release of PCBs.

247.    In August 2002, a NJDEP site inspection of the EPEC Facility found more than 30 drums scattered across the facility, many of them leaking.

248.    Shortly thereafter, NJDEP issued a Notice of Violation to EPEC requiring the disposal of the drums.

249.    During a subsequent November 2002 NJDEP site inspection that addressed leaking capacitor carcasses found at the EPEC Facility, NJDEP found that EPEC had failed to act upon the leaking drums and NJDEP collected and consolidated the drums on site.

250.    EPEC finally responded in March 2003, when it sampled the contents of the drums and found they contained waste materials with extremely elevated concentrations of

PCBs: Sample S-8 (12,300 mg/kg), S-9 (14,800 mg/kg), S-14 (150,000 mg/kg), S-15 (752 mg/kg), S-16 (556 mg/kg), and S-17 (439 mg/kg).

251.   In October 2002, capacitors with high PCB concentrations were found to be abandoned and broken open on a pad near the former maleic anhydride/phthalic anhydride production area on the EPEC Facility, which EPEC designated EPEC AOC 3.

252.   In November 2002, NJDEP responded to a complaint about leaking transformer oil at the EPEC Facility and confirmed the existence of multiple leaking capacitors.

253.   Subsequent soil sampling confirmed significantly elevated PCB (Aroclor 1254) soil contamination, with concentrations as high as 1,600 mg/kg (Sample AOC-3-4A).

254.   EPEC is responsible for the EPEC Facility discharges of hazardous substances from the pesticide production area, the leaking drums found on site, and/or the leaking capacitors found on site, which came to be located in the Wetland.

255.   Based on Weston's extensive sampling and analysis of the concentration and distribution of PCBs and BEHP in the Wetland, as depicted on Exhibits 2 and 4, the vast majority of the contaminant mass in the Wetland originated from the well-documented releases of these pollutants at and from the EPEC Facility.

256.   This conclusion is supported by multiple lines-of-evidence, including distribution patterns, documented releases in the manufacturing areas of the EPEC Facility, and the co-extensive prevalence of other hazardous substances within the Wetland that were not associated with the Hatco Facility but were used by the EPEC Facility, including BHT, diacetone alcohol, chlorotoluene, and benzaldehyde.

257.    EPEC is responsible for remediation of all releases of hazardous substances within its manufacturing areas, including PCBs and BEHP, which originated from the EPEC Facility and/or were disposed of at the EPEC Facility by Ashland operations.

### E.    Gredel Facility Discharges of Hazardous Substances

258.    Beginning in 1966, the Gredel Facility was owned by Cardell and was used as a recycling facility, asphalt batch production facility, for crushing operations, for vehicle maintenance, and as a junkyard—all in connection with construction business activities, and, in particular, road construction.

259.    The Gredel Facility operations did not comply with then-existing environmental, health and safety requirements.  Known violations included: (1) a failure to contain hazardous substances; (2) discharge to the Raritan River due to hazardous substances encroaching connected streams; and (3) releases of fuel oil from trucks and other unknown sources.

260.    Prior to operations, the site was overlain with historic fill containing PCBs, which encroached onto the Wetland (and the EPEC Facility specifically) and included Crows Mill Creek itself.

261.    Cardell stockpiled this PCB-laden fill material within the wetlands tidal area of the Raritan River.

262.    Cardell also accepted 300,000/cy of solid waste from Good Soil of New York that contained PCBs.

263.    Cardell also accepted 18,600 tons of Kaofin supplied by Marcal.

264.    Upon information and belief, the Kaofin accepted and disposed of on the Gredel Facility contained PCBs, in addition to other contaminants.

265.     In addition, numerous transformers containing PCBs were located throughout the Gredel Facility.

266.     The solid waste received from Good Soil of New York and accepted by Cardell contained materials and equipment containing PCBs and was released into the surrounding environment, including the Wetland.

267.     The Kaofin received from Marcal and accepted by Cardell, which contained PCBs, was released into the surrounding environment, including the Wetland.

268.     The transformers released PCBs into the surrounding soil of the Gredel Facility, which washed into the Wetland.

269.     Cardell did not contain or control stormwater at the site, allowing migration of hazardous substances throughout the Gredel Facility and the Wetland.  (*See* Exhibit 5.)

270.     Truck wash water and garage floor drains directed to catch basins discharged to drainage ditches that flowed westward onto the EPEC Facility and the Wetland.

271.     To date, known soil impacts at the Gredel Facility due to manufacturing and disposal operations include the following compounds: PCBs, benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoranthene, benzo(k)fluoranthene, indeno(1,2,3-cd)perylene, dibenz(a,h)anthracene, petroleum hydrocarbon, and metals (included arsenic, beryllium, cadmium, lead and zinc).

272.     To date, known surface water and leachate seepage impacts from the Gredel Facility to the Wetland include the following compounds: acenaphthene, 2,4-dimethylphenol, 3&4 methylphenol, anthracene, carbazole, dibenzofuran, fluorene, 2-methylnaphthalene, naphthalene, phenanthrene, and BEHP.

273.     As owner of the Gredel Facility, Gredel is responsible for remediation of all releases of hazardous substances to the Wetland, including PCBs and BEHP, on and/or originating from the Gredel Facility.

## VI.     WESTON'S CLAIMS

### COUNT I
### Cost Recovery Pursuant to CERCLA Section 107(A)

274.     Weston repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

275.     Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a), provides for cost recovery as it relates to the cleanup of a release of hazardous substances by the following covered persons:

(1)     the owner and operator of a vessel or a facility;

(2)     any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

(3)     any person who by contract, agreement, or otherwise arrange for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

(4)     any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of costs, of a hazardous substance, shall be liable for . . . (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.

276.     "Person" is defined in CERCLA Section 101(21) as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(20).

277.    "Owner" or "Operator" is defined in CERCLA Section 101(20) as "in the case of an onshore facility or an offshore facility, any person owning or operating such facility."  42 U.S.C. § 9601(20).

278.    "Facility" is defined in CERCLA Section 101(9) as "any building, structure, installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed[.]"  42 U.S.C. § 9601(9).

279.    "Disposal" is defined in CERCLA Section 101(29) by reference to RCRA and the Solid Waste Disposal Act ("**SWDA**"), 42 U.S.C. § 9601(29).  These statutes define "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).

280.    "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)[.]"  42 U.S.C. § 9601(22).

281.    "Hazardous substance" is defined in CERCLA Section 101(14) by reference to other federal statutes, including the SWDA and TSCA, and by reference to a list of substances published by EPA at 40 C.F.R. § 302.4.  42 U.S.C. § 9601(14).

282.    "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto.  42 U.S.C. § 9601(25).

283.    The EPEC Facility and the Gredel Facility are "facilities" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

284.    There has been a "release" and/or a threatened "release" of "hazardous substances" at the Wetland which has caused the incurrence of "response costs" by Weston, within the meaning of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

285.    Weston is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

286.    Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

287.    Both PCBs and BEHP are "hazardous substances" within the meaning of CERCLA Section 101(14), 42 U.S.C. § 9601(14).

288.    Weston's Wetland Investigation is in pursuit of a remedial response action within the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25).

289.    Weston's payment of the costs to dispose of comingled PCB and lead battery wastes is a removal response action within the meaning of CERCLA Section 101(25), 42 U.S.C. § 9601(25).

290.    Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(1) and/or 9607(a)(2), EPEC is liable as current and/or former owners, lessors, and/or operators of the EPEC Facility or as their successor-in-interest for the disposal and/or release of hazardous substances from the EPEC Facility into the Wetland.

291.    Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(1) and/or 9607(a)(2), Gredel is liable as current owner of the Gredel Facility or as the successor-in-interest to former operator Cardell

for the disposal and/or release of hazardous substances from the Gredel Facility into the Wetland.

292.    As a result of the release and/or threatened release of hazardous substances at and/or from the EPEC Facility and the Gredel Facility, now located at and/or on Wetland, Weston has incurred response costs and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

293.    The response costs incurred by Weston in connection with the Wetland, including, to date, around $3 million for the Wetland Investigation, and an additional $31,400 incurred as a cost to dispose of PCB waste generated by EPEC's remediation of lead battery contamination in the berm (EPEC only), are consistent with the NCP.

294.    Pursuant to CERCLA Section 107, 42 U.S.C. § 9607, each Defendant is strictly, jointly and severally liable for the voluntary past and future response costs incurred and to be incurred by Weston in response to the release and/or threatened release of hazardous substances at and/or from the EPEC Facility and the Gredel Facility, now located at and/or on the Wetland.

WHEREFORE, Weston respectfully requests that this Court enter judgment in its favor against each Defendant as follows:

a.  Finding that each Defendant is liable for its pro rata share of response costs incurred and to be incurred by Weston in connection with the release and/or threatened release of hazardous substances now located at and/or on the Wetland, and allocating each Defendant its pro rata share of the Wetland response costs incurred by Weston to date;

b.  An award of pre-judgment and post-judgment interest;

c.  An award of the costs of suit, including reasonable attorneys' fees and consultant fees, as permitted by law; and

d.  Any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT II
### Contribution Pursuant to the NJ Spill Act

295.    Weston repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

296.    Pursuant to the NJ Spill Act, "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance."  N.J.S.A. 58:10-23.11f.a(2)(a).

297.    "Person" in the NJ Spill Act is defined to mean any "public or private corporations, companies, associations, societies, firms, partnerships, joint stock companies, individuals, the United States, the State of New Jersey and any of its political subdivisions or agents."  N.J.S.A. 58:10-23.11b.

298.    "Hazardous substance" is defined in the NJ Spill Act by reference to other state and federal statutes, including by reference to and consistent with the definition set forth in CERCLA Section 101.  N.J.S.A. 58:10-23.11b.

299.    "Discharge" is defined in the NJ Spill Act to mean "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State."  N.J.S.A. 58:10-23.11b.

300.    Weston is a "person" within the meaning of the NJ Spill Act, N.J.S.A. 58:10-23.11b.

301.    The Defendants are "persons" within the meaning of the NJ Spill Act, N.J.S.A. 58:10-23.11b.

302.    Both PCBs and BEHP are "hazardous substances" within the meaning of the NJ Spill Act, N.J.S.A. 58:10-23.11b, and consistent with CERCLA Section 101.

303.    Each Defendant discharged hazardous substances on the Wetland and/or discharged hazardous substances on their respective portions of the Offsite Facilities that have now migrated to and come to be located on the Wetland.

304.    Pursuant to the NJ Spill Act, each Defendant is strictly liable for the investigation and remediation of the discharge of hazardous substances on and/or at the Wetland.

305.    Pursuant to the NJ Spill Act, each Defendant is strictly liable for its pro rata share of response costs incurred by Weston in investigating and remediating the discharge of hazardous substances on and/or at the Wetland, including the Wetland Investigation and in disposing of PCB waste in connection with EPEC's remediation of lead contamination in the berm.

306.    Weston has incurred, and will continue incurring in the future, costs in investigating and remediating the discharge of hazardous substances by the Defendants on and/or at the Wetland.

307.    The response costs incurred by Weston in connection with the Wetland, including, to date, around $3 million for the Wetland Investigation and an additional $31,400 incurred as a cost to dispose of PCB waste generated by EPEC's remediation of lead battery contamination in the berm (EPEC only), are consistent with the NCP and the NJ Spill Act.

308.    Pursuant to the NJ Spill Act, Weston is entitled to contribution and/or indemnification from each Defendant for the costs incurred in investigating and remediating

hazardous substances discharged on or at the Wetland by the Defendants, including, but not limited to, the costs of the Wetland Investigation and of the disposal of PCB waste generated by EPEC's remediation of lead battery contamination in the berm (EPEC only).

WHEREFORE, Weston respectfully requests that this Court enter judgment in its favor against each Defendant as follows:

   a. Finding that each Defendant is liable for its pro rata share of response costs incurred and to be incurred by Weston in connection with the release and/or threatened release of hazardous substances now located at the Wetland, and allocating each Defendant its pro rata share of the Wetland response costs incurred by Weston to date;

   b. Allocating the future costs for response actions taken at the Wetland using such equitable factors as the Court determines are appropriate;

   c. Injunctive relief against each Defendant requiring it to engage in the investigative process for the Wetland, including allowing Weston access to the Offsite Facilities for further sampling efforts;

   d. An award of pre-judgment and post-judgment interest;

   e. An award of the costs of suit, including reasonable attorneys' fees and consultant fees, as permitted by law; and

   f. Any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT III
## Common Law Contribution

309.    Weston repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

310.    To date, Weston has paid more than its fair share of response costs in connection with the Wetland, including around $3 million for the Wetland Investigation and an additional

$31,400 incurred as a cost to dispose of PCB waste generated by EPEC's remediation of lead battery contamination in the berm (EPEC only).

311.    These costs are all associated with contaminants that came to be located in and/or at the Wetland from the Offsite Facilities and not from the Hatco Facility.

312.    Pursuant to New Jersey common law contribution, each Defendant is liable for its pro rata share of response costs incurred by Weston to address the Wetland.

WHEREFORE, Weston respectfully requests that this Court enter judgment in its favor against each Defendant as follows:

a. Finding that each Defendant is liable for its pro rata share of response costs incurred and to be incurred by Weston in connection with the release and/or threatened release of hazardous substances now located at the Wetland, and allocating each Defendant its pro rata share of the Wetland response costs incurred by Weston to date;

b. An award of pre-judgment and post-judgment interest;

c. An award of the costs of suit, including reasonable attorneys' fees and consultant fees, as permitted by law; and

d. Any such other relief as the Court may deem just and appropriate under the circumstances.

### COUNT IV
### Declaratory Relief Pursuant to CERCLA Section 113(G) and the DJA

313.    Weston repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

314.    There is a present, actual, and justiciable controversy between Weston and the Defendants concerning the parties' respective rights and obligations with respect to the response costs associated with the Wetland.

315.    Weston seeks a declaratory judgment under CERCLA Section 113(g) and the DJA against the Defendants, holding each liable for its respective equitable share of response

costs that will be binding in any subsequent action to recover further response costs associated with the Wetland.

316.    CERCLA Section 113(g) provides that, in an action for recovery of costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2).

317.    The DJA provides, in relevant part, that "[i]n the case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought [and] [a]ny such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201(a).

318.    Weston is entitled to judgment against each Defendant for past and future response costs in connection with the Wetland pursuant to CERCLA and the DJA.

319.    Weston is also entitled to a declaration requiring each Defendant to engage in further investigation of the Wetland.

320.    A declaratory judgment is necessary for the purpose of settling and affording relief from uncertainty with respect each Defendant's liability to Weston.

WHEREFORE, Weston respectfully requests that this Court enter judgment in its favor against each Defendant as follows:

   a.  Declaring that each Defendant is liable under CERCLA and is obligated to pay for its respective, equitable shares of future response costs associated with the Wetland;

   b.  Declaring that each Defendant shall engage in further investigation of the Wetland;

   c.  An award of the costs of suit, including reasonable attorneys' fees and consultant fees, as permitted by law; and

d.  Any such other relief as the Court may deem just and appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Weston demands trial by jury in this action of all issues so triable with the undersigned acting as designated Trial Counsel.

Dated: Cherry Hill, New Jersey
May 2, 2022

COZEN O'CONNOR

By:     */s/ Peter Fontaine*
Peter J. Fontaine
Matthew L. Elkin
Amorie Hummel
1010 Kings Highway S.
Cherry Hill, New Jersey 08034
Phone: (856) 910-5000
Email: pfontaine@cozen.com
melkin@cozen.com
ahummel@cozen.com

*Attorney for Plaintiff Weston Solutions, Inc.*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not

the subject of other actions.

Dated: Cherry Hill, New Jersey
May 2, 2022

COZEN O'CONNOR

By:      */s/ Peter Fontaine*
Peter J. Fontaine

*Attorneys for Plaintiff Weston Solutions, Inc.*